ROWENA MORRIS CLARKE AND OTHERS *vs.* J. PORTEOUS DE-
VEAUX AND OTHERS.

C. conveyed, by deeds, certain bonds to D., in trust, to pay the income to C for
life, for the maintenance and support of himself and wife, and the support
and education of his children—neither *corpus* nor income to be liable for
his debts—and to hold the *corpus*, after his death, upon certain limi-
tations, for the benefit of his wife and children, with power in D. to re-
ceive payment of the bonds, and, from time to time, at the request of C., to
sell the *corpus*, and make investments; and with power in C. to discharge
D., with his consent, and substitute another trustee in his place The bonds
were collected by D., and invested in other securities; and, in 1863, C. exe-
cuted an instrument, under seal, whereby, with D.'s consent, he discharged
him from the trust, and substituted R. in his place; and, thereupon, D.
accounted to R., and, leading him to believe that all the securities had been
realized in Confederate money, transferred to him the *corpus* of the estate in
that currency, taking from him a receipt expressed to be "in full for princi-
pal of said trust in his (D.'s) hands:" *Held,* That the wife and children of C.
could maintain a bill in equity against D., C. and R., to compel D. to trans-
fer to R., as trustee, certain of the securities, which had not been realized
when he accounted to R., in 1863, and which he had fraudulently retained
for his own benefit, they being, at the time, of much greater value than
their amount in Confederate money; or to account for their value.

The interest of the wife and children of C. in the income was alone sufficient to
entitle them to maintain the bill—*semble.*

*Cestuis que trust,* whose interests are future and contingent, may, upon sufficient
ground, maintain a bill against the trustee and tenant for life to have their
interests secured.

The powers reserved to himself by C. did not make him the sole and absolute
owner of the property; nor did the power to sell and invest affect the
rights of the parties further than this, that, upon a sale under the power,
the trusts attached upon the proceeds, and then upon investments when
made.

A voluntary covenant to convey property in trust, will not be enforced in
equity; but where the trust has been created by an actual transfer or con-
veyance, equity will protect the interests of the *cestui que trust.*

The wife and children of C. held not to be concluded by the instrument dis-
charging D. from the trust, and substituting R. in his place, and the receipt
in full given by R. to D. for the *corpus* of the trust estate.

A deed, executed under a power reserved in a trust discharging the trustee,
and appointing another in his place, is not, of itself, a release of the dis-
charged trustee from liability to account.

A receipt is never conclusive when fraud or mistake is alleged against it; and
even a release given upon a fraudulent consideration is void.

The evidence reviewed, and the answer held to be contradicted by two wit-
nesses and corroborating circumstances.

A trustee's purchase from himself will be set aside at the mere option of his
*cestui que trust;* and in no way can he advance his own interests at the ex-
pense of the latter.

It was not a fraud on D., under the circumstances, to retain the Confederate
money he paid, and then, after it had become worthless, file a bill against
him to compel him to transfer the securities.

The remedy *held* not to be barred by lapse of time.

BEFORE JOHNSON, CH., AT CHARLESTON, FALL TERM, 1867.

This was a bill in equity, filed 29th September, 1866, by Rowena Morris Clarke, Charlotte Elizabeth Clarke and Mary Buist Clarke, plaintiffs, by their next friend, A. S. Johnston, against J. Porteous Deveaux, Frederick Richards and Joseph Pringle Clarke, defendants.

To the facts of the case, as stated in the Circuit decree and the opinion of the Supreme Court, it is only necessary to add here that the paper dated 28th October, 1863, a copy of which was filed with the answer of Deveaux as an exhibit, and which he relied upon as a release, was an instrument, under the hand and seal of the defendant, Clarke, whereby, after reciting the power of removal and substitution reserved to himself in the deeds of trust, he, with Deveaux's consent, discharged him from the trusts of the deeds, and appointed the defendant, Richards, trustee, in his place and stead; and that, after the Circuit decree had been filed, His Honor the Chancellor made a report, wherein he stated that his notes of evidence had been inadvertently destroyed, and certified that, on the trial of the case, "the Hon. J. B. Campbell, who was the attorney of J. Pringle Clarke when the settlement was made, and Frederick Richards, who was substituted as trustee in the place of Deveaux, were both sworn, and testified, substantially, that, from the representations made by Deveaux, at the time the settlement was made, they inferred that he had collected all the claims in action belonging to the trust estate, and that the estate consisted entirely in Confederate money."

The decree of His Honor the Chancellor was filed 27th November, 1868, and is as follows:

JOHNSON, Ch. On the 28th day of July, 1852, Joseph Pringle Clarke, the husband of Rowena Morris Clarke, and the father of Charlotte Elizabeth Clarke and Mary Buist Clarke, assigned and transferred to J. Porteous Deveaux a certain bond, conditioned for the payment of $20,000, secured by a mortgage on a plantation and fifty-four negro slaves, in trust, that he should pay over the interest or income to the said Joseph Pringle Clarke, or permit and suffer him, for life, to receive the same for the maintenance and support of himself and his wife, Rowena, and for the support and education of any children which they then had, or which they might thereafter have, so that neither the premises settled, nor the

income thereof, should be in anywise liable for the debts of the said Joseph Pringle Clarke; and after the death of Joseph Pringle Clarke, if his wife should survive him, then in trust to permit and suffer her to receive the interest during her life—or widowhood, if she should marry again—for the support of herself and child or children; and after her death or marriage, whichever should happen first, then in trust as to the premises settled, for the absolute use of the child or children of the said Joseph Pringle Clarke and Rowena M. Clarke, at that time living, if more than one, share and share alike; the issue then living of any deceased child to take by representation the parent's share, the share to be paid to them respectively on attaining the age of twenty-one years; and, until then, so much of the interest or income as J. Porteous Deveaux might deem necessary, to be applied to their support and education; and the surplus, if any, to be invested and added to the capital of the settled estate. But should J. Pringle Clarke survive his wife, then in trust, from and after his death, for the absolute use of his child or children at that time living, share and share alike, if more than one; the issue then living of any deceased child to take by representation the parent's share, the share to be paid to them on attaining the age of twenty-one years; and, until then, so much of the interest as J. Porteous Deveaux might deem necessary to be applied to their support and education; and the surplus, if any, invested and added to the capital of the settled estate. And, in case all the children of Joseph Pringle Clarke should die under the age of twenty-one years, without leaving issue, and unmarried, then in trust for such person or persons, and to and upon such estate, as Joseph Pringle Clarke might thereafter appoint, or direct by deed or will. And, in case Rowena M. Clarke, and all her issue, should die in the lifetime of Joseph Pringle Clarke, then from and after the extinction of Rowena M. Clarke and her issue, in trust for the absolute use and behoof of Joseph Pringle Clarke, his executors, administrators and assigns.

In the deed of assignments it is provided that it should be lawful for J. Porteous Deveaux, or any future trustee to be appointed in pursuance of the terms of the deed, to receive payment of the securities settled; and, from time to time, at the written request of J. Pringle Clarke, to sell the same, or any property which might be purchased by virtue of the power therein contained, and to invest as well the money to be so received in payment of the securities as the proceeds of such sales, with the written consent of Joseph

Pringle Clarke, in some other property, real or personal, subject to the same uses, powers and provisions therein expressed and declared, of the securities for the money settled. And, also, that if J. Porteous Deveaux, or any future trustee, should die, or be desirous to be discharged from the trusts created, it should be lawful for Joseph Pringle Clarke, by deed under his hand and seal, executed in the presence of two or more subscribing witnesses, to nominate and appoint some other person to be trustee, for the purposes aforesaid, in the place of J. Porteous Deveaux, or such other trustee as should die or desire to be discharged; and such new trustee, so appointed, should, from thenceforth, be equally interested in the trusts expressed, and be invested with the same powers as the trustee so dying or becoming discharged had been.

On the 13th day of January, 1854, the said J. Pringle Clarke executed another deed, by which he conveyed to the said J. Porteous Deveaux two other bonds, amounting, in the aggregate, to over $24,000, in trust; that he should hold the same, both as regarded the principal and interest, upon substantially the same trusts, limitations, conditions and provisions as were contained in the trust deed first executed, and which is, in effect, set out above.

J. Porteous Deveaux accepted the trust, and received into his possession the securities conveyed to him, and collected them, and invested the principal in the bonds of other persons. And upon making a showing of the securities which he had for the trust estate, on the first day of July, 1862, these were the securities, amongst others, which he exhibited as belonging to the trust estate, to wit: a bond of E. Witsell, conditioned for the payment of $3,350; a bond of C. M. Furman, conditioned for the payment of $4,000; a bond of I. K. Furman, conditioned for the payment of $2,500; and a balance of $5,500 of the *corpus* of the trust estate in the hands of the trustee.

On or about the 1st of November, 1863, Frederick Richards was substituted as trustee, under the deeds of settlement, in the place, room and stead of J. Porteous Deveaux, as provided for in said deeds, and, in *a few days afterwards*, a settlement was made between the said Richards and Deveaux, in which the latter gave the former a check on the Bank of the State of South Carolina for the sum of forty-five thousand one hundred and ninety-two dollars and seventy-eight cents, as constituting the entire principal of the trust estate; and the money was drawn from the bank in the Treasury notes of the Confederate States of America—because the bank was

then, and had for some time previously been, banking exclusively on such notes—and they have proved almost a total loss to the trust estate.

At the time this settlement was made, Joseph Pringle Clarke and Frederick Richards both supposed, from the information which they had received from J. Porteous Deveaux, that the whole trust estate had been actually collected in, and really consisted in Confederate Treasury notes; but, since the close of the late war, it was ascertained that the bonds of E. Witsell, C. M. Furman and I. K. Furman, were still unpaid, and in the hands of J. Porteous Deveaux.

The bill prays that the three bonds which, together, are conditioned for the payment of nine thousand eight hundred and fifty dollars, be produced and transferred to Frederick Richards, as a part of the trust estate; or, if either of them has since been collected, that he do pay over to the new trustee the proceeds, with interest on the same from the time it was collected; and, also, that he shall make good and pay any amount which he, or the firm of Deveaux & Heyward, owed the trust estate at the time of the settlement.

For any amount of money which the trustee, Deveaux, had on hand at the time of the settlement, I do not think that he can now be made liable for the same, for it was inferred, from what he said at the time, that he had the whole amount of the trust estate on hand, and, acting upon that information, Confederate money was received in payment.

The evidence before the Court is, that private bonds, well secured by mortgages on real estate, as were all of the three above mentioned, were worth, in Charleston, in November, 1863, a high premium; and two of the witnesses concur in the fact that they would have sold at a premium of five hundred per cent. Can such a transaction be protected in this Court, where trustees are required to deal with open hands—to make no profit out of the trust estate, except such as the law gives them? The trustee was cautious to protect himself by the mere forms of law, but this Court cannot sanction such a transaction.

It is ordered and decreed, that J. Porteous Deveaux do produce and transfer to Frederick Richards the bond of E. Witsell for $3,350, the bond of C. M. Furman for $4,000, and the bond of I. K. Furman for $2,500; and if either of them, or any portion of them, has been collected by the said Deveaux, since said settlement was

made, that he do account to the said Richards for the same, with interest.

It is also ordered and decreed, that it be referred to Master Gray to ascertain and report what payments have been made on said bonds since the first of November, 1863, if any; and also that he have leave to report any special matter.

It is also ordered and decreed, that J. Porteous Deveaux do pay the costs of these proceedings.

It is also ordered and decreed, that further orders may be taken at the foot of this decree.

Jno. Porteous Deveaux, executor of the last will of J. Porteous Deveaux, the defendant, who died after the argument, but before the decree was filed, appealed on behalf of his testator, and now moved this Court to reverse the decree, on the grounds:

1st. Because the bill, as to Deveaux, is a bill for discovery and relief, while, as to the other defendants, it is simply a bill for discovery; but the Chancellor has not only not given Deveaux the benefit of his answer, but has evidently used the other answer, contrary to all rule and reason, as evidence *against* Deveaux, though it was perfectly competent for the complainants to examine the defendants as witnesses.

2d. Because Deveaux's answer, denying the fact of fraud or misrepresentation charged in the bill, and to which he is specially interrogated, is conclusive, unless contradicted by two witnesses, or one witness and strong corroborating circumstances; that this was done does not appear from his Honor's recollection of the testimony, even if that be accurate, which is not admitted.

3d. Because there is no complainant before the Court who has any interest, either vested or contingent, in the subject of the suit, except Clarke, the defendant; no one has the least interest until his death; while, by the several powers reserved to himself, he may, at any time, change, destroy, or convert to his own use, the whole or any part of the trust estate; he is, therefore, still the owner, and the sole and absolute owner, of the whole property included in the said deeds.

4th. Because, while it is admitted that Clarke himself might have maintained a bill against Deveaux as *his* trustee, by reason of his possession of the choses in action, it is denied that any other person could; for if there are covenants in either of the deeds, they are

12

between Clarke and himself, or Clarke and Deveaux, for the benefit of Clarke alone; there are certainly none between Clarke or Deveaux and the complainants; besides, whatever, if any covenants there are in the said deeds, they are purely voluntary, and not enforceable in equity.

5th. Because it would be impossible for the complainants to maintain a bill against Clarke himself, to have the trusts of the two deeds declared and fixed; nor could the Court make such a decree without changing contingent into vested rights, excluding afterborn children, and taking from Clarke the powers which he has expressly reserved to himself by the said deeds.

6th. Because if the said Frederick Richards or the said Clarke, had, in November, 1863, declined to receive the check of the said J. Porteous Deveaux on the Bank of the State of South Carolina for $45,192.78, which they knew would probably be paid in currency, or had refused the currency when offered, and immediately given Deveaux notice, instead of waiting for near three years, it would have been in the power of the said Deveaux to use the money to great advantage; it is submitted, therefore, that their conduct in this particular was a fraud upon Deveaux, and accounts for their not being before the Court as complainants.

7th. Because if Clarke, who is not before the Court complaining of fraud or unfairness, is concluded by the release and settlement of November, 1863, as he certainly is, it is not competent for any one else claiming only *through* him to complain; neither can a defendant give to his answer the form of a bill of complaint against his co-defendant, and thus deprive him of the benefit of his answer.

8th. Because the decree is otherwise contrary to law and equity, and ought to be reversed.

*De Treville*, for appellant.

*McBeth & Buist, Simons & Seigling*, contra.

Oct. 9, 1869. The opinion of the Court was delivered by

Moses, C. J. The counsel for the defendant, Deveaux, submits, as a preliminary objection—fatal, in his judgment, if sustained—that there is no one but Joseph Pringle Clarke (his co-defendant) who has any interest in the subject-matter of the suit, he being still the owner, and the sole and absolute owner, of the whole property included in the deeds.

While the deeds convey the securities to the trustee, in trust, to pay the interest to Clarke, for life, or suffer him to receive it for the maintenance and support of himself and wife, and the support and education of his child and any children which he might thereafter have—so that neither the premises settled or the income should be in any wise liable for his debts—they convey interests, upon his death, to the wife and children, and it is not necessary to enquire whether they are vested or contingent.

In either event, they have the right to claim the interposition of the Court against the trustee for the security of the fund; and the relation in which they stand to the deeds under the first provision they direct, authorizes them to demand of him an exhibition of his accounts, so that they may have the means of knowing on what they could calculate for maintenance and education. The power reserved to the trustee, to receive payment of the securities settled, or, at the written request of Clarke, to sell the same, or any property purchased by virtue of the authority conferred, and invest the proceeds of said payment or sales in other property, to be held subject to the same uses, powers and provisoes as in the deeds are expressed, did not change or affect any rights of the plaintiffs.

If the remainder is only contingent, still the party representing it, as we have said, is not prevented from seeking the aid of this Court for its safety and preservation.

A *cestui que trust*, though entitled to a mere contingent benefit, may, upon reasonable cause shown, apply to this Court to have his interest properly secured.—Lewin on Trusts, 728.

In *Carson* vs. *Kennedy*, 8 Rich. Eq., 269, the Court said: "That it would be unwise and unsafe to hold that no contingent interest shall be protected by a remedy for the preservation of the property in case the contingent interest becomes vested. It would be unwise and unsafe to hold that no contingent interest should be protected in this way. An interest might be contingent, and yet so certain as to amount in value to a vested estate."

In *Simons and Wife* vs. *Logan*, reported in a note in 9 Rich. Eq., 184, Chancellor Harper, in a Circuit decree, not only maintains the same doctrine, but carries it further.

The bill here, in point of fact, seeks no more than to compel the original trustee to pay into the hands of the substituted trustee the securities which belong to the trust. It avers that he withheld the true and valuable securities for his own use, against his duty, and against equity and good conscience, and, in their stead, has trans-

ferred to the new trustee Confederate Treasury notes of no value; and that he did this, leaving the parties interested to suppose that he had received payment in the said notes, when the truth is conclusively established to the contrary. It comes within the principle of the cases referred to. The first trustee, whose office had entirely ceased by the appointment of the second, has now no right to retain the specialties returned by him, or the money which he may have received on them in payment; they should be in the hands of the legal owner, to be held and preserved by him for the persons beneficially interested.

It might not, probably, be stretching the jurisdiction of equity too far to say that one who holds for a contingent remainderman, and who fraudulently converts the estate confided to him to his own·use, may be held to answer for such disposition, either by requiring an account, and the payment of the money into Court, or, if the property is still under his control, to transfer it to the succeeding trustee.

An express trust, under the deeds, is declared in favor of the wife and children during the life of Clarke. The trust assumed by Deveaux was to pay over the interest or income to Clarke, or permit and suffer him, for life, to receive the same for the maintenance and support of himself and his wife, and for the support and education of his child, and of any children·he might thereafter have, so that neither the premises settled, nor the income thereof, should be, in any wise, liable for his debts, contracts or engagements. The wife and children were the beneficiaries contemplated during the life of Clarke. As against him, a trust is created in their favor; and the fact that the income is not to be liable to his debts shows that he has no power to abridge or destroy it.

There are no powers so reserved to Clarke, by the deeds, which constitute him still the whole owner of the property, as averred in the third ground of appeal. On their execution, his legal title was conveyed to the trustee on the conditions, limitations, and for the purposes expressed; and, although he holds, under them, interests and powers, he cannot be regarded as having the legal title. It would be a contradiction in terms to say that the very deeds which were to change the legal ownership so operated as to confer the title on the donor.

The power of the trustee, on the written request of Clarke, to sell the securities settled, or any property purchased by virtue of the authority expressed, and invest the money or proceeds of sale in

other real or personal property, made no change in the relations of the parties, or alterations of the trusts under which the trustee held. Whether, on payment of the securities, the money remained in the hands of the trustee, or was invested in property, the trusts of the deeds attached to the same extent as they did on the original fund.

It is claimed that the covenants in the deeds are voluntary, and can not be enforced in equity. If they are, however purely voluntary, they will, notwithstanding, be held good and binding between the parties.

Lord Eldon, in *Ellison* vs. *Ellison*, (6 Vesey, 661,) says: "I take the distinction to be, that if you want the assistance of the Court to constitute you *cestui que trust*, and the instrument is voluntary, you shall not have that assistance for the purpose of constituting you *cestui que trust;* as upon a covenant to transfer stock, &c., if it rests in covenant, and is purely voluntary, this Court will not execute that voluntary covenant; but if the party has completely transferred stocks, &c., though it is voluntary, yet the legal conveyance being effectually made, the equitable interest will be enforced by this Court."

Mr. Story, in the 2d volume of his Equity Jurisprudence, Sec. 793, *a*, says: "If the transfer is actually made, it will be held valid against the donor and his representatives." It would be difficult to find any authority contravening the rule thus laid down. The trustee accepted the trust with provisions in favor of the very *cestuis que trust* to whom he now denies the right to claim the benefit devolving on them by the very instrument to which he is a party.

It is assumed by defendant, Deveaux, that the instrument filed as an exhibit to his answer, dated October 28, 1863, but not delivered till 3d or 4th November following, connected with the receipt of Richards, (the substituted trustee,) concludes Clarke, and that it is not competent for any who claim through him to complain.

It is a great mistake to regard the said paper as a release. It was never so intended—does not, on its face, pretend to be—and has not about it any of the essentials which would constitute a bar against Clarke, if he was a plaintiff seeking the relief asked by the bill.

The whole purpose of it was to execute the power conferred by the deeds, to wit: to assent to the discharge of the original trustee, and to nominate and appoint a successor. It no where discharges

Deveaux from any liability for an account of the trust, or even refers to the fact that any supposed settlement has been made.

It is true that, on the same day, Deveaux had submitted what he averred was a statement of the trust fund in his hands, to wit: Confederate Treasury notes to the amount of $45,192.78, which were delivered over to the new trustee, through a check, and a receipt was given by him, expressed to be "in full for principal of said trust in his (Deveaux's) hands," and that the accounts leaving that balance due had before been .seen and examined by Clarke. From these facts, is it possible to deduce the conclusion which the defendant, Deveaux, desires should be accepted by the Court?

The receipt was nothing but an admission of the amount received by Richards from Deveaux. It was sufficient to impose a liability on the latter, but in no way prevented Richards or Clarke, or any one who had an interest under the deeds, to require Deveaux to account for bonds which, at the time, he retained in possession, leading those with whom he dealt, as trustee, to suppose that he had received payment of them in a depreciated currency. A receipt is never conclusive when fraud or mistake is alleged against it.

If, however, Clarke had executed a formal release, founded on the knowledge and information which he had derived from Deveaux as to what constituted the trust estate, and had the right, under the deed, to discharge him from all liability to account, and was himself seeking to charge Deveaux, under this bill, by reason of the allegations it contains, could such a release be successfully interposed?

Chancellor Harper, in *Gist* vs. *Gist*, Bail. Eq., 346, quoting from Lord Redesdale, in *Roche* vs. *Morgell*, 2 Sch. & Lef., 728, says: "Every release must be founded on some consideration, otherwise (as Lord Chief Baron Gilbert says, For. Rom., 57,) fraud must be presumed. That consideration must be either a valuable consideration then given, or the adjustment of depending accounts. In the latter case, the fairness of the accounts is of the essence of the consideration. If they are not fair, the consideration is not fair, and the instrument founded on such a consideration is in itself void, and, therefore, operates nothing."

Now, what consideration gives validity to the supposed release of Clarke? The bonds retained by Deveaux were of greater value than the Confederate money he paid over; and a trustee is not permitted to favor himself, in a pecuniary regard, at the expense of those whose interests he was appointed to preserve.

Two of the grounds of appeal seek a reversal of the decree: First, "because the bill, as to Deveaux, is a bill for discovery and relief; and, as to the other defendants, it is simply a bill for discovery; and the Chancellor has not only not given Deveaux the benefit of his answer, but has evidently used the other answer, contrary to all rule and reason, as evidence against Deveaux, though it was perfectly competent for the complainants to examine the defendants as witnesses;" and, secondly, "because Deveaux's answer, denying the fact of fraud or misrepresentation charged, and to which he is specially interrogated, is conclusive, unless contradicted by two witnesses, or one witness and strong circumstances."

Deveaux's answer in the important particular, to wit, the fact that he misled the parties with whom he was treating as to his retention of the three bonds, is contradicted by the two witnesses, Hon. J. B. Campbell and Mr. F. S. Richards. It is true that neither the answer of Clarke or of Richards could be used as evidence against the co-defendant, Deveaux; but there is no rule of law which forbids effect to the testimony of Richards, because he was a party defendant to the record. He, with the other witness, according to the report of the Chancellor—by which we must be governed—testified "that, from the representations made by Deveaux, at the time the settlement was made, they inferred that he had collected all the claims in action belonging to the estate, and that the estate consisted entirely in Confederate money."

Here is a direct contradiction of the answer by two witnesses. Circumstances, too, corroborate the allegations of the plaintiffs.

On the 1st of July, 1862, Deveaux furnished a statement of the principal of the trust estate, which showed that it consisted of bonds to the amount of $39,642.78, and a balance of cash of $5,500 due by him. On the 3d or 4th of November, 1863, when the parties met, the estate was transferred to the new trustee, not in the bonds, but in Confederate Treasury notes, to the amount of $45,192.78. Deveaux, in his answer, says that he was authorized by Clarke to receive Confederate currency. Although he denies that he said he had collected the bonds, had not the parties reason to assume that he had done so? No conversation in relation to the payment of the bonds was had as to what time received between July, 1862, and November, 1863, within which periods the Confederate currency had largely depreciated. He alleges that Mr. Campbell was aware that he had the three bonds with him; but in this the testimony of Mr. Campbell, so far from concurring, is

directly contradictory. If he did have the bonds with him, how was it that, of all the persons present, Mr. Campbell alone had knowledge of the fact?

No question is made as to the liability of Deveaux for the other bonds referred to in his statement of July, 1863. The plaintiffs have abandoned their grounds of appeal, and the question before us is only as to the bonds of C. M. Furman, I. K. Furman and E. Witsell; and, as to these, what are the facts?

They are admitted to have belonged to the trust estate which Deveaux held under the deeds. They were in his possession, unpaid, at the date of the supposed settlement. What was his plain duty? To have transferred them to Richards, who succeeded him as trustee. As they had not been paid, from whom did he purchase them, if he claims to hold them as owner? Suppose that Clarke had power, under the deed, to change the securities, and had so directed Deveaux, was it competent for him so to sell them as to secure a benefit to himself, and induce a prejudice to his *cestuis que trust?*

The relation between trustee and *cestui que trust* is one of such a delicate and confiding character that the Courts are watchful to preserve it, not only by requiring the utmost good faith, but also by preventing every wrong which might possibly flow from the advantages which the position affords. It is, therefore, held that, even if a trustee purchases the trust property at its full value, the *cestui que trust*, at his option, may set aside the sale. The *bona fides* of the transaction is not involved. The act may bring no loss to the *cestui que trust;* but, to secure the administration of the trust according to the intention and purpose of the instrument creating it, those who accept this position—so necessary and important to society—must be held to such an account as will preserve the estate confided to them to the ends proposed by the trust. If any other rule was substituted the trustee would have an advantage which could be converted to his own benefit to the prejudice of those whose interests he was intended to promote. "So that, in fact, in all cases, where a purchase has been made by a trustee, on his own account, of the estate of his *cestui que trust*, although sold at public auction, it is in the option of the *cestui que trust* to set aside the sale, whether *bona fide* made or not. So a trustee will not be permitted to make any profit or advantage to himself in managing the concerns of the *cestui que trust;* but whatever benefits or profits are obtained will belong exclusively to the *cestui que trust.* In short, it may be laid down as a general rule, that a trustee is bound not

to do anything which can place him in a position inconsistent with the interests of the trust, or which have a tendency to interfere with his duty in discharging it."—1 Story Eq., § 322.

He cannot purchase or acquire, by exchange, the trust property.—*Wormley* vs. *Wormley*, 8 Wheat., 424. And, if he has power to sell and re-invest, he must exercise it justly and fairly, and without the influence of selfish purposes.—*Ibid.* And, above all, he is not permitted to advance his own interest at the expense of the *cestui que trust.*—*Garrow* vs. *Davis*, 15 Howard, 272 ; *Prevost* vs. *Gratz*, Pet. C. C., 364.

The principles thus intimated have been constantly enforced by the Courts of this State. They are founded in wisdom and morality, and are necessary to guard against the temptation and cupidity by which the best of men may sometimes be betrayed.

We do not perceive how it can be maintained, as claimed by the sixth ground of appeal, that the conduct of the said Richards and Clarke, in the receipt of the Confederate money, operated as a fraud upon Deveaux. They accepted it under the belief that the said bonds had been *bona fide* paid to him in the same currency which was depreciated, when compared with gold, to the extent of $12 for one, as is shown by the testimony. This false impression was induced by him ; and to hold that, because the currency received was not returned, the plaintiffs are debarred from a remedy through which the bonds may be saved to the trust estate, in which they are interested, and which bonds he, Deveaux, induced them to suppose had been paid, would, in truth, be giving him the benefit of his own wrong.

Deveaux's trust did not terminate until the third or fourth of November, 1863, and the bill was filed on 29th September, 1866. There is nothing in this lapse of time which can protect him.

The motion is dismissed.

*Willard*, A. J., concurred.